Page 109

1 Q That was your custom and practice; right?
2        MR. MICHIENZIE: Objection.
3 A Yes.
4 Q You understood that you'd get this notice, you
5    needed to send it to Ocwen in order to get your
6    renewal premium paid to keep you coverage in
7    effect?
8        MR. MICHIENZIE: Objection.
9        MR. HOYT: Objection.
10 A Yes.
11 Q You didn't expect Mr. Salent to make that
12    payment; right?
13 A No. What I expected of Mr. Salent --
14 Q I'm not going to get into anything else. You
15    didn't expect him to make the payment?
16 A No.
17 Q You didn't expect MPIUA to pay itself?
18 A No.
19 Q You expected the bank to make the payment?
20 A Yes.
21 Q You knew that if the payment wasn't made, there
22    would be no coverage in effect on and after
23    January 8, 2004?
24 A Yes.

Page 110

1 Q Now, at any point in time after you received
2    Exhibit 3 in early December of 2003 and the date
3    of the fire, did you have any communications
4    with MPIUA?
5 A No, sir.
6 Q When was the first occasion you or anyone on
7    your behalf had communication with MPIUA after
8    the fire?
9 A Mr. Salent told me to send a check for $500 with
10    anybody. I couldn't go. I sent it with my son.
11 Q When was that?
12 A Well, it was the Monday afternoon of the fire.
13 Q So it was the day of the fire?
14 A Yes, took place at midnight, and he went in the
15    day.
16 Q So your son attempted to go pursuant to
17    Mr. Salent's instructions, at least, that's what
18    you're claiming?
19 A Yes.
20 Q He attempted to go to MPIUA and pay a premium
21    after the fire had occurred?
22 A Yes.
23 Q And MPIUA wouldn't accept that; is that right?
24 A Yes, sir.

Page 111

1        MR. WHOLLEY: That's all I have.
2    Thank you.
3        MR. HOYT: Nothing from me.
4        MR. MICHIENZIE: Just a couple of
5    follow up questions. If I could just mark this
6    with everyone's indulgence.
7
8        REDIRECT EXAMINATION
9 BY MR. MICHIENZIE:
10 Q Mrs. Charles, these are documents that were
11    produced by Ocwen, they are Bate stamped
12    numbered 290, 91, 92, 93, 94, 95, and 301 and
13    302. These are a series of letters that are
14    addressed to you, Mrs. Charles.
15        MR. MICHIENZIE: If we could mark this
16    as Exhibit 26 as a composite exhibit.
17        (The document was marked as Exhibit
18        No. 26.)
19 Q Tell me if you recognize these documents and if
20    you received these documents.
21 A (Witness reviews document.) Yes, I remember
22    receiving this.
23 Q So referring to the letter dated October 28,
24    2004, you remember receiving that?

Page 112

1 A Yes.
2 Q If you could go to the next one. The next
3    document is a letter dated June 15, 2004. Do
4    you remember receiving that?
5 A Yes.
6        MR. HOYT: They appear similar, but
7    they are not the same document.
8 Q Did you receive a copy of that document?
9 A Yes.
10 Q If we could go to the document dated May 19,
11    2004, did you receive a copy of that?
12 A This is in Spanish, I do not read Spanish. "In
13    the event you have filed bankruptcy." I can't
14    remember exactly, but I may or may not. I'm not
15    that sure.
16 Q You're not sure about that one?
17 A I'm not sure about that one.
18 Q There's a letter dated March 19, 2004, did you
19    receive that?
20 A I can't tell you that I have received this. Let
21    me read a little more. (Witness reviews
22    document.) Yes, I received this letter also.
23 Q If you don't mind me asking one last question,
24    which is, what was the highest level of formal

Page 105

1  A  Yes. That's the guy who called. Okay. And I
2     said, "Okay, I will give you Mr. Greene's
3     number," and he never got back to me or anything
4     like that. Because it's a Chinese name, I
5     remember him by Young.
6  Q  Are you saying that you did have a telephone
7     conversation with Ian Young shortly after the
8     fire?
9  A  We didn't have a big conversation. He just said
10    he represented some insurance company. I said,
11    "I do not have insurance on the property." I
12    told him that. I say, "I do not have insurance
13    on the property. The property has no insurance.
14    This is my lawyer's number. You can speak to
15    him."
16 Q  So your testimony is that you gave Mr. Young
17    Mr. Hoyt's telephone number?
18 A  Mr. Greene. His boss.
19        MR. HOYT: My firm.
20 Q  Did you have any further telephone discussion
21    with Mr. Young after that?
22 A  No.
23 Q  When you told Mr. Young you don't have any
24    insurance, did he tell you that you do have

Page 106

1     insurance, and it's with this forced placed
2     insurance company?
3  A  To the best of my knowledge, no.
4        MR. CHAPMAN: I think that's all I
5     have. Thank you.
6        MR. WHOLLEY: I will be brief.
7
8        CROSS EXAMINATION
9  BY MR. WHOLLEY:
10 Q  Ms. Charles, my name is Rich Wholley, I'm
11    representing MPIUA here today. I'm just going
12    to come over there, too.
13        MR. WHOLLEY: Can I mark this as the
14    next exhibit, please
15        (The document was marked as Exhibit
16        No. 25.)
17 Q  I want to place a document in front of you,
18    Ms. Charles. Would you take a look at that and
19    tell me when you have had a chance to review it.
20 A  (Witness reviews document.)
21 Q  Did you have a chance to review that?
22 A  Yes, sir.
23 Q  A few moments ago when Mr. Chapman, down the end
24    of the table there, was questioning you, I think

Page 107

1     you had indicated, correct me if I'm wrong, that
2     you got a letter back from MPIUA with that check
3     for $1,906 saying that MPIUA couldn't write any
4     coverage because the property was damaged. Is
5     that right?
6  A  Yes, sir.
7  Q  Is that the letter you were talking about?
8  A  Yes.
9  Q  So you did receive that?
10 A  Yes, I did receive that.
11 Q  Did that have the check enclosed?
12 A  No.
13 Q  But at that point in time, you knew from MPIUA's
14    perspective that there was no coverage in
15    effect, and they wouldn't write coverage until
16    the property would be repaired; right?
17 A  Be repaired, yes.
18 Q  Exhibit 22, I know you stated to Mr. Chapman you
19    don't recall whether you received this or not;
20    is that right? You just don't remember?
21 A  I know I received like this stating that Ocwen
22    tried to pay the insurance.
23 Q  Am I correct in stating that that $1,906 check,
24    based on your understanding, was paid by Ocwen

Page 108

1     or attempted to be paid by Ocwen to MPIUA?
2  A  Yes.
3  Q  And you understand that they attempted to make
4     that payment after the fire loss in February 2,
5     2004?
6  A  Yes, sir.
7  Q  Then you did get Exhibit 25, which advised you
8     that MPIUA was not accepting that check?
9  A  Yes, sir.
10 Q  For the reasons we have discussed?
11 A  Yes.
12 Q  Now, going back to Exhibit 3. As I understand
13    your testimony, when you received this in early
14    December of 2003, you understood that unless
15    MPIUA received a premium payment, which is
16    indicated on here, a minimum of $476.56, unless
17    they received that by January 8 of 2004, your
18    coverage with MPIUA would lapse. You understood
19    that; right?
20 A  Yes, I know that.
21 Q  That's why, just like you had done the year
22    prior in December of '02, again in December of
23    '03, you sent this thing to Ocwen?
24 A  To Ocwen, yes, I did.

Page 101

1  A  Weeks Insurance Agency Company.
2  Q  Was that your insurance agent before you started
3      getting your insurance through Mr. Salent?
4  A  Yes.
5  Q  Was there any insurance agent between Mr. Weeks
6      and Mr. Salent?
7  A  No.
8          MR. CHAPMAN: I'm going to mark this
9      as a two-page document from the plaintiff's
10     document production.
11         (The document was marked as Exhibit
12         No. 22.)
13 Q  For the record, the first page of Exhibit 22 is
14     a letter dated February 10, '04 from Ocwen to
15     Joan Charles.  And the second page of the
16     exhibit is a check, Ocwen check, dated 2/6/04 in
17     the amount of $1,906.  Could you take a look at
18     that, Mrs. Charles.  First of all, with respect
19     to the first page of Exhibit 22, do you recall
20     getting that letter?
21         MR. HOYT: Is there any way we can
22     just mark it as 23?
23         MR. CHAPMAN: Well, I was just going
24     to ask her if they went together or not.

Page 102

1          MR. HOYT: Okay.
2  A  (Witness reviews document.) I can't see anything
3      on this.
4  Q  Let me start with the letter. The letter that's
5      marked Number 22. Do you remember getting that
6      letter?
7  A  (Witness reviews document.) I can't remember,
8      you know. I can't remember receiving it.
9  Q  Now, you see this check that we have, a copy of
10     that check?
11 A  I never saw no check.
12         MR. CHAPMAN: Why don't we just mark
13     the check as Number 23.
14         (The document was marked as Exhibit
15         No. 23.)
16 Q  Let me ask you this, Mrs. Charles. Aside from
17     Exhibits 22 and 23, do you remember Ocwen trying
18     to pay your insurance with MPIUA shortly after
19     the fire?
20 A  Yes, I remember that.
21 Q  What do you remember about that?
22 A  I got a letter from the insurance stating that
23     Ocwen sent a check for this amount of money to
24     pay the insurance, but they couldn't accept it

Page 103

1      because the house was burnt.
2          (The document was marked as Exhibit
3          No. 24.)
4  Q  Mrs. Charles, I'm going to hand you what we have
5      now marked as Exhibit 24. It's a letter from
6      Cunningham Lindsey to you, dated February 11,
7      '04. If you take a look at that, and then my
8      question is going to be, do you remember getting
9      that letter.
10 A  (Witness reviews document.) No.
11 Q  You don't remember getting that letter?
12 A  No.
13 Q  By the date stated on the letter, February 11,
14     '04, would it be your best testimony that you
15     were receiving mail at the post office and to
16     the Ditson Street address pursuant to the
17     forwarding order?
18 A  Yes.
19 Q  Do you have any particular reason to say you did
20     not get this letter?
21         MR. HOYT: Objection.
22 A  Because I was not receiving mails at the present
23     address that I am living at at this time.
24 Q  But the address stated on this exhibit --

Page 104

1  A  14 Ditson Street. Because although the house
2      was burnt, the post people used to put mail
3      there. Sometimes the guy opposite, if he see
4      him put any mail, he would say, "No, take it
5      back." But the other times you go there and
6      find mails, and it's wet because of rainfall and
7      it was snow time. Everything was wet. He
8      pushed it through the door.
9  Q  Did you ever have any telephone communications,
10     any other kind of direct communication with
11     anyone from a company called Cunningham Lindsey?
12 A  I can't say from Cunningham and Lindsey. I
13     cannot say because people call, and they just
14     say, "This is so and so, and could you please
15     call me back at this number." So you don't know
16     who it is. Sometimes -- many times, I used to
17     say, "I don't know who it is."
18 Q  The name of the person on this exhibit, do you
19     recognize that name? Did you ever talk to that
20     person?
21 A  Yes, Young.
22 Q  What's the person's name?
23 A  Mr. Young.
24 Q  What's the full name? Ian C. Young?

---

**Page 93**

1  little stickers?
2  A  Handwrite it. I always handwrite it.
3  Q  So if you don't have a specific memory of
4      handwriting a return address on the envelope
5      that you sent to Ocwen in December of '03, would
6      it be your testimony that it was your practice
7      to handwrite it?
8  A  It is and up to now I still do it on everything
9      that I send out, every bill.
10 Q  Did the letter that you mailed to Ocwen with the
11     premium invoice come back to you via the return
12     mail?
13 A  No, never returned.
14 Q  Now, counsel this morning showed you
15     Mr. Salant's answers to interrogatories, I think
16     it was in Exhibit 9. Counsel showed you
17     Mr. Salent's answer to Number 20. Do you
18     remember that? I'm sorry, Number 17.
19 A  (Witness reviews document.) Um-hmm.
20 Q  Now, if you I understand your testimony
21     correctly, Mrs. Charles, you disagreed with what
22     Mr. Salent is saying happened in this answer to
23     Number 17. Is that fair to say?
24 A  Yes, because I did not have anything with Ocwen

---

**Page 94**

1      Bank before that incident of paying the premium.
2      I never had any.
3  Q  So basically, you disagree with what Mr. Salent
4      is saying?
5  A  Yes, this here, I disagree.
6  Q  And I believe your testimony this morning,
7      correct me if I'm wrong, is that when you got
8      Exhibit 3, you sent that into Ocwen without any
9      involvement from Mr. Salant; correct?
10 A  Yes.
11 Q  From the time you sent in Exhibit 3 in early
12     December '03 up until the time of the fire, you
13     had no contact with Mr. Salent; is that correct?
14 A  Yes, that's correct.
15 Q  So from the time you sent in Exhibit 3 to Ocwen
16     up until the time of the fire, you were not
17     looking to Mr. Salent to do anything on your
18     behalf; is that correct?
19 A  All he had to do if he knew the property had no
20     insurance, he was to write me or call my phone
21     and leave a message, which he did if I had no
22     insurance or if he needed something else.
23 Q  Let me ask you this. During that period of
24     time, from early December of '03 up until the

---

**Page 95**

1      time of the fire, had you asked Mr. Salent to do
2      anything on your behalf?
3  A  In what manner?
4  Q  What I'm asking is, did you specifically ask
5      Mr. Salent, was there a time where you went to
6      Mr. Salent within that window of time, from
7      early December '03 until the time of the fire in
8      February '04, was there any time where you asked
9      Mr. Salent to do anything for you within that
10     period of time?
11 A  No, sir.
12 Q  Did you ever ask Mr. Salent what information he
13     received about your insurance within that period
14     of time?
15 A  When the fire took place, I asked him, and he
16     said he did not even receive anything from the
17     insurance company as yet to say that the
18     insurance was canceled. After the fire, a
19     few -- about two weeks after, then I heard they
20     sent out a notice that it had no insurance on
21     the property due to nonpayment of the insurance.
22 Q  So with reference to the date on Exhibit 3,
23     which is early December of '03, when was the
24     last time prior to when you received that

---

**Page 96**

1      Exhibit 3 notice that you do remember talking to
2      Mr. Salent for any reason?
3  A  Rephrase that question again?
4  Q  Sure. Do you have Exhibit 3 in front of you?
5  A  Yes.
6  Q  That's the notice that you got in early December
7      '03.
8  A  Yes.
9  Q  When is the last time before early December '03
10     that you remember having any particular
11     discussion with Mr. Salent?
12 A  Since when Option One made a mess of the
13     insurance, didn't pay the insurance. That was
14     when.
15 Q  That was a period of years before that; right?
16 A  That was when I went over to New Century
17     Mortgage.
18 Q  Which was in early '02; correct?
19 A  Yes, I think early '02.
20 Q  So if I'm understanding you right, the last time
21     you remember having a direct contact with
22     Mr. Salent prior to the fire was when you were
23     starting with New Century in early 2002; is that
24     fair?

---

Page 89

1      MR. WHOLLEY: The Fair Plan is MPIUA,
2   by the way.
3 A   All in all, I received these, and I just mail it
4   out.
5      MR. HOYT: Sorry. Just to object. I
6   believe that there may have been kind of a
7   misrepresentation of Mrs. Charles' response
8   regarding that particular document. I just want
9   to clarify. I don't believe she answered that
10   she actually received that document. I would
11   like to have this -- and I will tell you where
12   I'm going. I got that from MPIUA, and produced
13   it in the lawsuit. I believe, if we can ask the
14   question in a -- because she doesn't remember
15   specifically getting it -- in a theoretical
16   sense, as opposed to I just want to make sure
17   she is not identifying, and the questions aren't
18   geared towards that particular exact document,
19   which I don't believe she said, "I received that
20   document."
21      MR. CHAPMAN: I will let you do that,
22   because my memory is that she testified that she
23   did get this and sent it into Ocwen.
24      MR. HOYT: Exhibit Number 3, but not

Page 90

1   Exhibit Number 21.
2      MR. CHAPMAN: I'm asking that because
3   she said it was generally handled the same way
4   the year before, and it's the same type of form.
5      MR. HOYT: Right, and the only
6   distinction I'm trying to make is, I believe,
7   she said she didn't remember getting Exhibit 21,
8   but then the theoretical questions of would it
9   have been handled the same way, I have no
10   objection to.
11 Q   Let me ask you this. Do you have a specific
12   memory of getting Exhibit 21?
13 A   That was in --
14 Q   On or about November 29, '02?
15 A   '02, yes.
16 Q   And I think you previously testified that you do
17   specifically recall that the year before the
18   bill was sent into Ocwen, and there were no
19   problems; right?
20 A   No problems, right.
21 Q   Is it your best testimony that Exhibit 21 was
22   the bill for your insurance for the prior year
23   that you sent to Ocwen?
24 A   Yes.

Page 91

1 Q   Earlier this morning you testified about some
2   phone calls you made right after the fire. You
3   had a telephone discussion with Harold Salent,
4   you made a call to Paul Petrocelli, and on the
5   Tuesday after the fire, you also called Ocwen
6   Bank. Do you remember testifying to that?
7 A   Yes.
8 Q   That was a conversation in which the Ocwen
9   representative told you that Ocwen had not
10   received any notification to pay the insurance
11   premium; right?
12 A   Yes.
13 Q   In response, you said something to the effect
14   of, "Well, Ocwen paid the insurance last year,
15   why didn't you pay the insurance this year?"
16   That's a question you asked to the Ocwen
17   representative on the Tuesday after the fire?
18 A   Yes.
19 Q   When you asked the Ocwen representative that
20   question, what was that person's answer?
21      MR. MICHIENZIE: Objection.
22      MR. HOYT: Go ahead and answer.
23 A   The person said they are unable to determine
24   that. And then when I called, another one

Page 92

1   said -- it's so many conversations I had with
2   these people in between those days. One said
3   her name was Betty, the supervisor was Betty.
4   She said they didn't receive any notice or
5   something like that. I said, "But I sent out a
6   notice, I sent out the tax paper. If you're
7   paying the taxes, why didn't you pay the
8   insurance?" And the escrow was there.
9 Q   Did anyone ever answer that question?
10 A   No, she never answered the question.
11 Q   Now, the notice that you sent to Ocwen in -- it
12   was early December of '03; right?
13 A   It was somewhere around there, yes.
14 Q   You filled out the envelope, you handwrote the
15   address of Ocwen that was contained on your last
16   billing statement?
17 A   On the billing statement, yes.
18 Q   You put a first class stamp on that; right?
19 A   On that, yes.
20 Q   Did you put a return address on the envelope?
21 A   I can't remember. I usually do, but I can't
22   remember if I did that day.
23 Q   When you usually use a return address at that
24   time, would you handwrite it or did you have

Page 77

1   Q  What is your understanding of what a reference
2      is?
3   A  When somebody refers you as a person in a job or
4      anything, like a good reference or whatever it
5      is.
6   Q  Do you know what that term means with respect to
7      an insurance policy?
8   A  No, sir.
9   Q  Are you aware of your insurance claim against
10     Assurant or against MPIUA being sent to a
11     referral or for a referral?  Have you ever heard
12     that before?
13        MR. WHOLLEY: Objection.
14  A  No, I never heard it.  Never knew about anything
15     like that.
16        (The document was marked as Exhibit
17        No. 18.)
18  Q  Ma'am, I'm going to show you what's been marked
19     as Exhibit 18.  It's called a Producers'
20     Operation Manual, and ask you if you have ever
21     seen that document before?
22  A  (Witness reviews document.) No, I have never
23     seen anything like this.
24        (The document was marked as Exhibit

Page 78

1        No. 19.)
2   Q  Mrs. Charles, what's before you now has been
3      marked as Exhibit 19.  This is a Statement of
4      Loss from MPIUA.  It is a 33-page document, and
5      ask you if you have ever seen that document
6      before today?
7   A  (Witness reviews document.)
8        MR. HOYT:  Any idea if this was
9      produced by MPIUA?
10       MR. MICHIENZIE:  I think it was
11     produced by MPIUA.
12  A  I've never seen that.
13  Q  You've never seen that?
14  A  No.
15  Q  Did you ever get a letter that is what we call a
16     Reservation of Rights letter?  Do you understand
17     what that is?
18  A  No, sir.
19  Q  Other than the letter that we've marked as
20     Exhibit 15, have you received any other letters
21     from MPIUA?
22  A  No.
23       (The document was marked as Exhibit
24     No. 20.)

Page 79

1   Q  Ma'am, what I have marked now as Exhibit 20 is a
2      letter dated July 29, 2005 from Runan Belcher of
3      Assurant to Frank Hall at MPIUA, attached to
4      which is a Statement of Loss or actually an
5      Adjuster Summary.  It is a 13-page document.
6      Have you see this document before today?
7   A  (Witness reviews document.) No, sir.
8   Q  You were aware of a check in the amount of
9      $86,489.91 that was issued from Assurant with
10     respect to the fire loss?
11  A  That is what my lawyer told me.
12  Q  When were you first made aware of that check?
13  A  It was in 2005.  I can't remember exactly.
14  Q  This year?  Last year?
15  A  Last year.
16       MR. MICHIENZIE:  I'm just going to go
17     off the record for two minutes.
18       (Off the record.          )
19  BY MR. MICHIENZIE:
20  Q  Mrs. Charles, were you contacted directly by
21     anyone from Ocwen Federal Bank after February 2,
22     2004?
23  A  No.
24  Q  No phone calls?

Page 80

1   A  A lot of phone calls came from someone called
2      Jordon.  She just used to say, "This is Jordon
3      from Ocwen Federal Bank calling for payment." A
4      lot of that.
5   Q  Who did she call?
6   A  Me.
7   Q  She called you?
8   A  Yes, she left the messages.
9   Q  You never spoke to her?
10  A  I called once, and I didn't get the person.  And
11     she called back -- See, I'm a lady that goes to
12     work on a morning, I leave home many times like
13     7, 6:30, 7:30, because I take care of the
14     elderly on mornings.  From there, I go to
15     Brigham & Women's Hospital.  I get home at 12 in
16     the night.  So I take the message.  When I am
17     off -- like today I'm off of Brigham.  My
18     patient I had to do today I did on Monday, so I
19     compensated her.  So today I'm free.  When I'm
20     free, I will return my calls.
21  Q  Did you ever tell this person or anybody that
22     called from Ocwen not to call you?
23  A  Yes, I left a message, I said, "Please do not
24     call back.  Anything, to contact my lawyer,

Page 37

1    MPIUA, you cut off the invoice, you put it in an
2    envelope, and you mailed it to an address that
3    was provided on the back --
4  A On the back for Ocwen Bank, yes.
5  Q Which bill did you look at for the address, do
6    you recall?
7  A The loan bill.
8  Q For what month?
9  A For December month.
10 Q This invoice for the insurance was mailed out
11   separately from your payment for the mortgage?
12 A Yes.
13 Q Your testimony today is that you do not recall
14   specifically what address you mailed this to; is
15   that right?
16 A I can't.
17         (The document was marked as Exhibit
18         No. 6.)
19 Q Mrs. Charles, I am marking now as Exhibit 6 a
20   document entitled Mortgage. This is a 15-page
21   document, bearing Bate's Number C0054 through
22   C0068. Ma'am, I would ask you to review that
23   document and tell me if you have seen that
24   before?

Page 38

1  A (Witness reviews document.) Yes.
2  Q Are those your initials on each of the bottom of
3    those pages?
4  A Yes.
5  Q Your signature appears on the 14th page of the
6    mortgage. Do you see that?
7  A Yes.
8  Q Is that your signature?
9  A Yes, it is.
10 Q You executed this at the closing on this loan
11   for New Century Mortgage Corporation on
12   January 7, 2002; is that right?
13 A Yes.
14 Q When you closed on this loan, you were required
15   to obtain property insurance; is that right?
16 A Yes, sir.
17 Q Did you choose a broker for your insurance?
18 A I don't understand what you mean.
19 Q Was One Call your insurance agent?
20 A Yes.
21 Q Did you choose that agent?
22 A My loan officer, he worked with -- it's in the
23   same building with Mr. Salent. So that's how I
24   got Mr. Salent, One Call Agency as my --

Page 39

1  Q Your insurance broker?
2  A Yes.
3  Q Do you know Harold Salent?
4  A Fairly well.
5  Q Who is he?
6  A Well, he's the owner of the insurance broker
7    company.
8  Q You say you know him fairly well. How so?
9  A Well, because when I transferred this loan from
10   Option One, it was the same problem, they did
11   not pay my premium. I had to go there. So I
12   usually sometimes go to Mr. Salent's office and
13   give him the check.
14 Q How did you know Option One hadn't paid your
15   premium?
16 A I was refinancing and New Century Mortgage
17   called me and told me I have no insurance on the
18   property. The same night I called Mr. Salent,
19   and he told me he did not even know.
20 Q Had you received a notice that you had --
21 A No.
22 Q Let me ask you the question first, okay. Had
23   you received a notice of termination of your
24   insurance?

Page 40

1         MR. HOYT: Objection.
2  A No, sir.
3         MR. HOYT: Which one?
4         MR. MICHIENZIE: Option One.
5  Q Do you understand my question?
6  A Yes.
7  Q We're talking about Option One; is that right?
8  A Yes.
9  Q So you never received any notice of renewal?
10 A No.
11 Q Notice of termination?
12 A No.
13 Q And you did what, you went to One Call?
14 A Yes.
15 Q What did you do when you went to One Call?
16 A At 8 p.m., I gave Mr. Salent a check.
17 Q Do you know what he did with the check?
18 A He paid the insurance.
19 Q Was your insurance reinstated?
20 A Yes, 24 hours after.
21 Q Was that loan an escrowed loan. Do you know
22   what I mean by that?
23 A Yes, sir.
24 Q What do you understand that to mean?

**Page 1**

```
1                            Volume:   1
                             Pages:    1-116
2                            Exhibits: 1-26

3          UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
4
                                    C.A. NO. 04-11625-RWZ
5
*****************************************x
6  JOAN CHARLES
              Plaintiff
7
         vs.
8
OCWEN FEDERAL BANK, FSB; OCWEN FINANCIAL
9  CORPORATION; MASSACHUSETTS PROPERTY INSURANCE
UNDERWRITERS ASSOCIATION; and ONE CALL
10 INSURANCE AGENCY, INCORPORATED
              Defendants
11 *****************************************x

12           DEPOSITION OF JOAN CHARLES, a

13 witness called on behalf of the Defendant, Ocwen

14 Federal Bank, FSB, pursuant to the applicable provisions

15 of the Federal Rules of Civil Procedure, before Camille

16 Macomber, Registered Professional Reporter and Notary

17 Public within and for the Commonwealth of

18 Massachusetts, at the Law Offices of Michienzie &

19 Sawin, LLC, 745 Boylston Street, Boston, Massachusetts,

20 on Wednesday, September 20, 2006, commencing at

21 10:20 a.m.

22
              SHEA COURT REPORTING SERVICES
23             ONE UNION STREET, SECOND FLOOR
                 BOSTON, MASSACHUSETTS 02108
24                    (617)227-3097
```

**Page 2**

```
1  APPEARANCES:

2      PORTNOY & GREENE, P.C.
       By James Hoyt, Esquire
3      687 Highland Avenue
       Needham, Massachusetts 02494
4        On behalf of the Plaintiff

5
       MICHIENZIE & SAWIN, LLC
6      By Paul Michienzie, Esquire
       and Christopher J. DeCosta, Esquire
7      745 Boylston Street
       Boston, Massachusetts 02116
8        On behalf of Ocwen Federal Bank FSB,
         and Ocwen Financial Corporation
9
10     LAW OFFICES OF RICHARD F. WHOLLEY
       By Richard F. Wholley, Esquire
11     17 Kimball Hill Drive
       Haverhill, Massachusetts 01830
12       On behalf of Massachusetts Property
         Insurance Underwriters Association
13
14     NELICK, PORTER & SHEA, LLP
       By William D. Chapman, Esquire
15     28 State Street
       Boston, Massachusetts 02109
16       On behalf of One Call Insurance Agency
17
18
19
20
21
22
23
24
```

**Page 3**

```
1                    I N D E X

2  WITNESS        DIRECT   CROSS   REDIRECT  RECROSS

3  Joan Charles
     By Mr. Michienzie...5...............111
4    By Mr. Chapman.............82
     By Mr. Wholley.............106
5
6
7               E X H I B I T S

8  NO.    DESCRIPTION                          PAGE

9  1   Notice of Taking Deposition..............premarked

10 2   First Request for Production of Documents
       to Plaintiff Joan Charles....................12
11
   3   Renewal Offer/Premium Invoice.................17
12
   4   Expiration Notification Homeowners Policy
13     Program......................................17

14 5   Plaintiff's Answers to Interrogatories
       Propounded by Defendant Ocwen Loan Servicing...30
15
   6   Mortgage.....................................37
16
   7   Notice of Assignment, Sale or Transfer of
17     Servicing Rights.............................42

18 8   Hazard Insurance Authorization and
       Requirements.................................43
19
   9   Defendant One Call Insurance Agency, Inc.'s
20     Answers to Defendant Ocwen Federal Bank, FSB's
       First Interrogatories........................53
21
   10  Letter to Joan Charles from Harold Salant,
22     dated 8/7/00.................................54

23
                -Exhibits Continued-
24
```

**Page 4**

```
1                E X H I B I T S

2  NO.    DESCRIPTION                          PAGE

3  11  Handwritten document produced by One Call,
       dated 7/16/99................................55
4
   12  Note from Assurant Group.....................59
5
   13  Letter to Joan Charles from Runan Belcher,
6      dated 2/03/04................................63

7  14  Equifax Credit Report, dated April 5, 2005.....68

8  15  Letter dated February 26, 2004 to Joan
       Charles from Frank Hall......................71
9
   16  Letter to Mrs. Charles from MPIUA.............74
10
   17  Letter from Joan Charles to MPIUA.............76
11
   18  Producers' Operation Manual..................77
12
   19  Statement of Loss from MPIUA.................78
13
   20  Letter dated July 29, 2005 from Runan Belcher
14     of Assurant to Frank Hall at MPIUA, with
       attachments..................................78
15
   21  Renewal Offer/Premium Invoice for 2002.........87
16
   22  Letter dated February 10, 2004 from Ocwen
17     to Joan Charles.............................101

18 23  Ocwen Check, dated 2/6/04 in the amount of
       $1,906......................................102
19
   24  Letter from Cunningham Lindsey to
20     Mrs. Charles, dated February 11, 2004..........103

21 25  Letter from MPIUA to Mrs. Charles.............106

22 26  Series of letters Bate Stamped Number 290,
       291, 292, 293, 294, 295, 301 and 302..........111
23

24     (Original Exhibits Retained by Attorney Michienzie)
```