# EXHIBIT 8

Page 17

1  Q  In November of 2003?
2  A  Yes.
3         (The document was marked as Exhibit
4         No. 3.)
5  Q  Mrs. Charles, I'm going to put before you a
6     document that has been marked as Exhibit 3.
7     This is document titled, Renewal Offer/Premium
8     Invoice, and I'm going to ask you if this is the
9     document to which you are referring as having
10    received in November of 2003?
11 A  (Witness reviews document.) It looks like it.
12        MR. MICHIENZIE: I'm going to mark
13    another exhibit, Exhibit 4.
14        (The document was marked as Exhibit
15        No. 4.)
16 Q  Mrs. Charles, this is a document entitled
17    Expiration Notification Homeowners Policy
18    Program, and this is dated December 4, 2003.
19    Did you receive this document with Exhibit 3 in
20    November of 2003?
21        MR. HOYT: Objection. I need you to
22    clarify. I'm not sure I understood the last
23    little parts of that.
24 A  This one with One Call Insurance Agency, One

Page 18

1     Call never sent out notice of premium to me. It
2     was --
3  Q  Which document are you referring to?
4  A  This one.
5  Q  Exhibit 3.
6  A  3, okay. It was -- what do they call the
7     insurance itself?
8         MR. HOYT: If you don't know, I won't
9     be able to help you.
10 Q  The actual insurance company?
11 A  This is the agent. This is the agent.
12 Q  Did you receive something from MPIUA, the
13    Massachusetts Property Insurance Underwriting
14    Association?
15 A  Yes.
16 Q  Exhibit 4, is that what you received?
17 A  No, what I received from the insurance company
18    was something like this where you tear off and
19    send in the payment to the bank.
20 Q  So you received something like Exhibit 3?
21 A  Yes.
22 Q  I'm going to refer to the Massachusetts Property
23    Insurance Underwriting Association as MPIUA.
24        MR. WHOLLEY: That's fine.

Page 19

1  Q  So you think you received something that looks
2     like Exhibit 3 from MPIUA?
3  A  Yes.
4  Q  When did you receive that?
5  A  That was in December month. I really can't
6     recall when it was.
7  Q  So you don't know when you received it.
8  A  No, I can't remember exactly when it was.
9  Q  But it was November or December?
10 A  November or December month, yes.
11 Q  Of 2003?
12 A  Yes, but late into the November month to early
13    December.
14 Q  Did you maintain a copy of that after the fire?
15 A  No, that was destroyed by the water.
16 Q  That was destroyed?
17 A  Yes.
18 Q  I want to get back again to the document
19    production, Exhibit 2. You did not have a copy
20    of Exhibits 3 or 4 that survived the fire; is
21    that right?
22 A  This one, Exhibit 4, I think only a part of this
23    I had. Exhibit 4.
24 Q  You had part of Exhibit 4?

Page 20

1  A  Yes.
2  Q  Did you give that to your counsel?
3  A  I think so.
4         MR. MICHIENZIE: Have you produced a
5     copy of that?
6         MR. HOYT: There's thousands of
7     documents. I have no idea what we have produced
8     or not produced.
9         MR. MICHIENZIE: I have what you
10    produced, and I only have a partial copy of that
11    exhibit. I don't have anything that looks like
12    it was fire damaged, water damaged in any way.
13        MR. HOYT: I will state unequivocally
14    that we've produced everything that is non
15    objectionable that was in Ms. Charles'
16    possession. As I understand it, she gave us
17    everything that she was able to salvage from the
18    fire.
19 Q  Tell me, as best you can, Mrs. Charles, what it
20    was that you salvaged from the fire that you
21    gave your counsel, documents?
22 A  Well, it's two years and eight months, going
23    into nine months, I really can't remember all
24    that I salvaged.

**Page 21**

1  MR. MICHIENZIE: For the record, I
2  would like to be able to inspect a copy of
3  whatever the original documents are that you
4  have and given by your counsel.
5  Q  So when you got this notice, Exhibit 4, what did
6     you do when you received it in either November
7     or December of 2003.
8  A  Exhibit 4?
9  Q  Yes.
10     MR. HOYT: Can I ask you to ask the
11  question again. I'm not sure that I caught what
12  the actual question is.
13     MR. MICHIENZIE: Can you read back the
14  question, please?
15     (The last question was read.)
16     MR. HOYT: Objection.
17  Q  Do you understand the question?
18  A  Yes.
19  Q  When you received the notice, what did you do
20     with it?
21     MR. HOYT: Objection. She's not
22  stated that she received the notice. You're
23  putting words in her mouth.
24     MR. MICHIENZIE: Her testimony was

**Page 22**

1  that she had part of Exhibit 4 that survived the
2  fire, so presumably it existed before the fire,
3  and she gave it to you.
4  A  Yes, but that was from the year before, 2002,
5     insurance policy.
6  Q  2002?
7  A  Yes.
8  Q  So it's not Exhibit 4 that you're talking about
9     now?
10 A  Not for 2003.
11 Q  So let's clarify again, Mrs. Charles. Your
12    testimony today is that you did not receive
13    Exhibit 3 or Exhibit 4; is that right?
14    MR. HOYT: Objection.
15 A  Not from Mr. Salant, no, not at all.
16 Q  Not from anybody?
17 A  No, I received a payment from the insurance
18    company either late in November to early in
19    December.
20 Q  A payment statement, a mortgage payment
21    statement?
22 A  No, insurance.
23    MR. HOYT: If I can clarify. A bill,
24 not a payment.

**Page 23**

1  A  Yes, a bill.
2  Q  A bill?
3  A  Yes.
4  Q  It didn't look like either Exhibit 3 or Exhibit
5     4?
6  A  It looked like this (indicating).
7  Q  It looked like Exhibit 3?
8  A  Yes.
9  Q  You received that from whom again?
10 A  The Massachusetts Property Insurance
11    Underwriting Association.
12 Q  Your testimony is that it's something that
13    looked like Exhibit 3?
14 A  Yes.
15 Q  But it was not Exhibit 3?
16 A  Not from One Call agency.
17 Q  Did you receive a copy of Exhibit 3 from
18    anybody?
19    MR. HOYT: Objection. Go ahead and
20 answer.
21 Q  Do you understand my question?
22 A  Yes.
23 Q  Okay.
24 A  Massachusetts Property Insurance.

**Page 24**

1  Q  So MPIUA, as far as you know, sent you
2     Exhibit 3?
3  A  Yes.
4  Q  The exhibit that you have in front of you?
5  A  Yes.
6  Q  When you received that, what did you do with
7     that document? What action did you take in
8     response to receiving that document, if any?
9     MR. HOYT: Objection.
10 Q  From time to time there will be objections from
11    counsel in the room, but you need to answer the
12    question unless your counsel instructs you to do
13    otherwise.
14 A  Okay. I mailed it out to Ocwen Bank.
15 Q  What address did you mail it to?
16 A  Behind Ocwen statement that they sent the
17    payment, they have an address to send the
18    insurance to, and an address to send the
19    property taxes to. That was the address that I
20    sent it to where the insurance to go to.
21 Q  How did you send it? What way did you send it,
22    regular mail?
23 A  Regular mail.
24 Q  Did you keep a copy of what you sent to Ocwen?

Page 25

1  A  No.
2  Q  Did you copy the envelope?
3  A  No.
4  Q  What was the address that you sent it to?
5  A  I can't remember it out of my head, but behind
6     the bill, as I told you, there were the
7     addresses where you sent it to.
8  Q  When did you do that?
9  A  About two days after I received it that
10    insurance bill.
11 Q  This Exhibit 3 has got a date billed December 4,
12    2003. Do you see that?
13 A  Yes.
14 Q  So you received that sometime after that date?
15 A  Around that, yes.
16 Q  Well, it's dated the 4th of December 2003.
17 A  Yes.
18 Q  Have you ever received a bill before the date on
19    the bill?
20       MR. HOYT: Objection.
21 A  What bill?
22 Q  Any bill. Have you ever received a bill from
23    the bank or an insurance company before the date
24    of the bill?

Page 26

1        MR. HOYT: Objection.
2  A  Payment for Ocwen Bank.
3  Q  It says, "Date billed, December 4, 2003." Do
4     you see that on Exhibit 3?
5  A  Yes, I'm not speaking about insurance, I'm
6     speaking about my loan payment. I receive it
7     before?
8  Q  Ma'am, we were just talking about Exhibit 3, and
9     you said you sent a copy of Exhibit 3 to Ocwen
10    Bank; is that right?
11 A  The payment, this little part where you tear
12    off.
13 Q  The payment invoice piece you sent to Ocwen
14    Bank?
15 A  To Ocwen Bank, yes.
16 Q  It says, "Date billed December 4, 2003." Do you
17    see that?
18 A  Yes.
19 Q  I'm talking about this document now, not a bill
20    that you received from Ocwen.
21 A  Okay.
22 Q  Would you agree with me that you received this
23    invoice sometime after December 4, 2003?
24 A  Yes.

Page 27

1  Q  Then, within a few days after that, you mailed
2     it to Ocwen?
3  A  Yes.
4  Q  What did you put on the envelope? To whom did
5     you address it?
6  A  I can't remember exactly, but it was the address
7     that they had on the back of the Ocwen bill that
8     I put it to.
9  Q  Do you have any copies of Ocwen's bills?
10 A  I think so.
11 Q  Have you produced any to your counsel?
12 A  I can't remember. I may have, as well as I may
13    not have.
14 Q  Mrs. Charles, I'm going to ask you to take this
15    document request and review it again, and if you
16    have any documents that respond to that request
17    give them to your counsel.
18 A  Okay.
19 Q  We need those documents.
20       MR. HOYT: Sir, I will ask you not to
21    instruct my client.
22       MR. MICHIENZIE: Sir, I will ask you
23    to do what you're obligated to do, which is to
24    give the document request to your client, so

Page 28

1     they can review --
2        MR. HOYT: If you have no evidence,
3     sir, that I have not done so, if you're accusing
4     me of not doing so, please bring a motion.
5        MR. MICHIENZIE: Her testimony today
6     is that she hasn't seen that document request
7     before.
8        MR. HOYT: Please continue your
9     deposition, sir.
10 Q  Mrs. Charles, the tenants that you had at 14
11    Ditson Street, how did they pay you, what form
12    of payment?
13 A  The tenant on the first floor, she paid by a
14    check.
15 Q  The third floor tenant?
16 A  They paid cash.
17 Q  Did you have a bank account at that time?
18 A  Yes.
19 Q  What was the name of the bank?
20 A  Citizens Bank.
21 Q  Do you still have that account open today?
22 A  Yes, sir.
23 Q  What branch is that?
24 A  Well, it was opened in Jamaica Plain.

Page 33

1  off; is that right?
2  A  Yes.
3  Q  So when you mailed Exhibit 3, you just took that
4     document and mailed the invoice on the bottom
5     the way it was; is that right?
6  A  Yes.
7  Q  You put nothing on that document?
8  A  No, because they have a number.
9  Q  So what's on there is the policy number, and you
10    sent that document the way it was with no
11    notations whatsoever; is that right?
12 A  No.
13 Q  No, meaning yes, there was nothing on it; is
14    that right?
15 A  That if I wrote a note or anything like that?
16 Q  Right.
17 A  No.
18 Q  So you put no notations on that invoice. You
19    just sent it the way it was?
20 A  Yes.
21 Q  What else do you recall sending to Ocwen, other
22    than a tax statement or this invoice, Exhibit 3?
23 A  Payments.
24 Q  Payments. Where did you send the payments, do

Page 34

1     you remember?
2  A  Ocwen Federal Bank.
3  Q  Where Ocwen Federal Bank? Do you know where?
4     Massachusetts?
5  A  No, to Florida, I think it is. When they sent
6     out a statement, it always has a part for the
7     envelope. You just put the bill, and you put
8     your check.
9  Q  Did you forward this invoice along with your
10    payment for your mortgage?
11 A  Yes, you will have to send in a piece, yes.
12 Q  So is it your testimony today that this invoice
13    for the insurance was submitted with your
14    payment in December of 2003?
15       MR. HOYT: Objection.
16 A  No.
17 Q  It was sent separately?
18 A  Separately.
19 Q  So you paid your bill using the envelope that
20    Ocwen sent you?
21 A  Yes.
22 Q  The bill for the mortgage payment?
23 A  Yes.
24 Q  But you separately sent this invoice to Ocwen to

Page 35

1     an address that was provided?
2  A  Yes.
3  Q  Your testimony is that address was on the back
4     of your billing statement?
5  A  Yes.
6  Q  Which billing statement did you use for the
7     address when you sent this invoice out?
8  A  They had the address printed, so all I did is
9     put it into the envelope in the window, and mail
10    it with the check.
11 Q  Let's go back, again, for a second. This
12    document, this Renewal Offer/Premium Notice,
13    your testimony is that came from MPIUA, is that
14    right, Exhibit 3?
15 A  Well, I will tell you the truth. I'm not so
16    sure, but it came -- how it came is my insurance
17    premium was going up 700 and something dollars
18    for the next year.
19 Q  How did you know it was going up that much?
20 A  Because they wrote it, they wrote me a letter
21    stating that my insurance will be -- it used to
22    be 1,200, it will be 1,900 and something, which
23    went up 700 and something dollars.
24 Q  Who did that letter come from?

Page 36

1  A  I really can't remember who it came from.
2  Q  I just want to fully and as completely as
3     possible understand your testimony today. I
4     want to make sure I understand what you said.
5     Is it your testimony that with this invoice,
6     Exhibit 3, there was an envelope that came for
7     you to put this invoice in and mail it off?
8        MR. HOYT: Objection.
9  A  Which invoice?
10 Q  Exhibit 3.
11 A  No, not the tax paper.
12 Q  This is an insurance premium, ma'am.
13 A  The insurance premium, no.
14 Q  Please put Exhibit 3 in front of you so that
15    we're clear what we are talking about.
16 A  (Witness complies.)
17 Q  When this invoice was mailed out, what exactly
18    did you do? Did you just cut the invoice off,
19    put it in an envelope, write an address on the
20    envelope and mail it out?
21 A  Yes.
22 Q  So it didn't come with a return envelope?
23 A  No.
24 Q  So Exhibit 3 came from somebody, your testimony,

Page 53

1 Q So other than just sending out that invoice the
2   way it is, you took no action to insure that the
3   bank received it; correct?
4 A Correct. I was in hospital in December month.
5 Q But you made no phone calls to Ocwen?
6 A No.
7 Q You didn't send it certified mail?
8 A No, sir.
9 Q You didn't contact One Call or MPIUA, did you,
10  to confirm that the policy had been paid?
11 A No.
12 Q So the only thing you did was send out that
13   invoice?
14 A Yes, sir.
15 Q Had you ever been canceled before for nonpayment
16   of an insurance premium?
17 A That is with Option One.
18 Q What year was that? Was it in 2000?
19 A 2000 -- I can't remember if I had a cancellation
20   at that time. I don't recall that. I know it
21   was with Option One we had canceled.
22       (The document was marked as Exhibit
23       No. 9.)
24 Q We have marked as Exhibit 9 here, Defendant One

Page 54

1   Call Insurance Agency, Inc.'s Answers to
2   Defendant Ocwen Federal Bank, FSB's First
3   Interrogatories. I'm going to ask you,
4   Mrs. Charles, to take a look at that and tell me
5   if you have ever seen that document.
6 A (Witness reviews document.)
7       MR. HOYT: Well, I never sent it to
8   you.
9 A Never.
10 Q You have never seen that before?
11 A No.
12 Q I will just call your attention to interrogatory
13   answer 17.
14 A (Witness reviews document.) No, this is not
15   true.
16 Q Does that help you refresh your memory in any
17   way in terms of having any other discussions
18   with Mr. Salent?
19 A The only discussion I had with Mr. Salent on
20   that day when he told me to get someone to go
21   down to pay that insurance.
22       (The document was marked as Exhibit
23       No. 10.)
24 Q Mrs. Charles, I'm going to show you what has

Page 55

1   been marked as Exhibit 10, this is a letter
2   dated August 7, 2000, addressed to you from
3   Harold Salent. Do you see that?
4 A August the 7th, 2000?
5 Q Correct.
6 A (Witness reviews document.)
7 Q Do you recall receiving that?
8 A I really can't remember this at all.
9 Q Any reason to believe that you didn't get a copy
10  of this?
11      MR. HOYT: Objection.
12 A I can't remember.
13      (The document was marked as Exhibit
14      No. 11.)
15 Q Mrs. Charles, I'm going to show you what has
16   been marked as Exhibit 11. Do you recall having
17   your insurance canceled for nonpayment in 1999?
18 A (Witness reviews document.)
19      MR. MICHIENZIE: For the record, this
20  is a handwritten note that was produced, I
21  believe, by One Call, it's dated 7/16/99.
22      MR. HOYT: I will object to this being
23  introduced.
24      MR. MICHIENZIE: It's not going into

Page 56

1   evidence, it's being marked as a deposition
2   exhibit.
3       MR. HOYT: Well, I'm not sure what it
4   refers to.
5 Q Have you ever seen this before?
6 A I can't remember this at all.
7 Q You have no memory of being canceled in 1999,
8   your insurance canceled in 1999?
9 A I can't remember. But first of all, Mr. Salent
10  never sent like a written note like this. If
11  anything, it's a typewritten letter.
12 Q Mrs. Charles, my question is, have you ever seen
13   this document before?
14 A No.
15 Q You have no memory --
16 A I don't believe so at all.
17 Q You have no memory of be being canceled in 1999?
18 A I can't remember. What bank that was with when
19   that was canceled?
20 Q I get to ask those questions, Mrs. Charles. You
21   don't recall receiving a letter the following
22   year instructing you to contact your mortgage
23   company about the renewal --
24      MR. HOYT: Objection.

Page 61

1   MR. HOYT: I'm just objecting because
2   all of her knowledge came through us.
3 Q  Was a claim made on your behalf to the insurance
4   company?
5 A  It's so long after that. This guy left a
6   message for me, and when I did get back to him,
7   I gave Mr. Hoyt his number that Mr. Hoyt would
8   speak to him, because I did not understand about
9   these things.
10 Q  But my question to you is, are you aware of any
11   claim being made against this Assurant policy to
12   pay for repairs to your property?
13 A  I know they went into the property.
14 Q  Did you sign any documents that were submitted
15   to the insurance company so that you could be
16   paid for the damage to your property?
17 A  No, sir.
18 Q  You never did?
19 A  No.
20 Q  Did you ever receive any money from any
21   insurance company?
22 A  No, sir.
23 Q  Are you aware that there was a check cut by the
24   insurance company?

Page 62

1 A  Mr. Hoyt told me so.
2 Q  Are you also aware that the check was returned?
3 A  Yes.
4   MR. HOYT: I need to clarify. Your
5   office has that check. We can go off the
6   record.
7   MR. MICHIENZIE: I understand. This
8   isn't about my knowledge, this is about what she
9   knows.
10   MR. HOYT: All right, I just wanted to
11   be sure it wasn't lost.
12 Q  Why didn't you cash the check?
13 A  Me?
14   MR. HOYT: Objection.
15 Q  Yes.
16 A  I never received a check in my hand.
17 Q  If I gave you that check today, would you cash
18   that check?
19   MR. HOYT: Objection.
20 A  No, sir.
21 Q  Why not?
22   MR. HOYT: Objection.
23 A  Because right now anything it's in my lawyer's
24   hand. I cannot cash a check.

Page 63

1   MR. HOYT: Do you want to go off the
2   record? Are you prepared to -- We would love to
3   start construction. Are you prepared to endorse
4   that on behalf of Ocwen? They are obviously a
5   payee, loss payee.
6   MR. MICHIENZIE: Why don't we go off
7   the record here.
8   (Discussion off the record.)
9   (The document was marked as Exhibit
10   No. 13.)
11 Q  Mrs. Charles, I'm putting in front of you a
12   document marked Exhibit 13. This is a letter to
13   you dated February 3, 2003 from Runan Belcher,
14   Claims Examiner, at the Assurant Group. Do you
15   recall receiving that letter?
16 A  (Witness reviews document.)
17 Q  Is there an answer to that question?
18 A  I can't remember at all.
19 Q  Did you ever have any discussions with Runan
20   Belcher?
21 A  I can't remember the name, but I returned a
22   gentleman's call, and he was to call me back and
23   he never called back. Then somebody else
24   called, and I gave the number to Mr. Greene's

Page 64

1   office because I could not handle it anymore. I
2   could not.
3 Q  When was that?
4 A  It is somewhere in 2004.
5 Q  Sometime in February of '04?
6 A  Yes, sometime.
7 Q  There were communications from Assurant Group;
8   is that right?
9   MR. HOYT: Objection.
10 A  I really can't say Assurant Group or who group.
11   They leave a message, call them, this is
12   somebody from someplace about the fire.
13 Q  Was it to adjust an insurance claim for the
14   fire?
15 A  I can't remember what the person said. All I
16   remember that I called back that person, one
17   never called back. Then another one called, and
18   I gave the number to Mr. Greene, I said, "I
19   cannot handle it."
20 Q  What did you understand those calls were about?
21 A  The property.
22 Q  The insurance on the property?
23 A  One said it was insurance. When one called, I
24   said, "The property has no insurance."

Page 65

1  Q  What did they say?
2  A  He said he's from someplace. I said, "Well, all
3     you have to do is get to my lawyer, because I
4     cannot handle it."
5  Q  So this was in February of 2004?
6  A  Yes.
7  Q  Mrs. Charles, I'm going to ask you to put
8     Exhibit 5 in front of you, please.
9  A  (Witness complies.)
10 Q  These are your interrogatory answers; correct?
11 A  Yes.
12 Q  Ma'am, I will represent to you that in your
13    complaint in paragraph 78 of the complaint you
14    filed against the defendants, you alleged that
15    the defendants conduct caused plaintiffs
16    emotional distress. In your answer to
17    interrogatory 12, it was stated for you --
18        MR. HOYT: Objection.
19 Q  Do you see the answer there, "Plaintiff states
20    that the defendant Ocwen's actions and inactions
21    as alleged in her many complaints and pleadings
22    has effectively destroyed plaintiff's quality of
23    life, causing amongst other hardships severe
24    emotional distress."

Page 66

1  A  Oh yes.
2  Q  Can you tell me, ma'am, whether you have
3     received any treatment for this distress? Have
4     you seen any counselors?
5  A  No.
6  Q  Any medical help?
7  A  No.
8  Q  Any hospitalization?
9  A  Not emotional, no.
10 Q  Have you suffered any financial loss?
11 A  A lot.
12 Q  Tell me what your financial loss is?
13 A  Well, my rent upstairs was 2,000 per month,
14    downstairs was 1,200. I had furniture that
15    furnished the top floor and my floor, which I
16    have nothing left. Nothing remained. I just
17    had to buy like a box spring and a mattress to
18    lay on, to sleep on. Nothing was retained but a
19    few pieces of clothes, which I had to put to
20    wash for days.
21 Q  Have you made any attempts at all to repair the
22    property?
23 A  I can't, because I have to pay rent.
24 Q  Did you get any estimates to repair the

Page 67

1     property?
2  A  Yes, sir.
3  Q  Have those estimates been produced in this case?
4        MR. HOYT: I'm not sure.
5        MR. MICHIENZIE: I'm just requesting a
6  copy.
7        MR. HOYT: They're fairly recent
8  stuff. I will check on it.
9  Q  So there have been no repairs to the property at
10    all?
11 A  No, sir.
12 Q  The reason why is because you don't have the
13    money to make the repairs; is that right?
14 A  No, sir.
15 Q  Have you made any attempts to go to a bank to
16    borrow money to make repairs?
17 A  They won't lend me money on a house that is
18    burnt.
19 Q  But have you made any attempts to go to a bank?
20 A  No.
21 Q  Any attempts to secure any financing to make
22    repairs to the property?
23 A  No, sir.
24 Q  To borrow money to make the repairs from

Page 68

1     anybody?
2  A  No. One guy came to me and I know he was a loan
3     shark, so I did not accept it.
4  Q  Mrs. Charles, were you ever late on any mortgage
5     payments before the fire?
6  A  Not of my doing. Once a mortgage payment was
7     late to Washington Mutual because of the
8     refinancing.
9  Q  Were you ever late on making any payments to
10    Ocwen?
11 A  No, sir.
12 Q  You haven't made a mortgage payment since the
13    fire loss; is that right?
14 A  No, sir.
15 Q  Do you know whether you were reported 30 days
16    late at any time prior to the fire for mortgage
17    payments to Ocwen?
18 A  No, I can't remember that. Not at all.
19 Q  Have you ever seen a copy of any credit reports?
20 A  I did not.
21        (The document was marked as Exhibit
22  No. 14.)
23 Q  Mrs. Charles, I'm going to give you what's been
24    marked as Exhibit 14 to review. It's a five

Page 77

1  Q  What is your understanding of what a reference
2     is?
3  A  When somebody refers you as a person in a job or
4     anything, like a good reference or whatever it
5     is.
6  Q  Do you know what that term means with respect to
7     an insurance policy?
8  A  No, sir.
9  Q  Are you aware of your insurance claim against
10    Assurant or against MPIUA being sent to a
11    referral or for a referral?  Have you ever heard
12    that before?
13        MR. WHOLLEY:  Objection.
14 A  No, I never heard it.  Never knew about anything
15    like that.
16        (The document was marked as Exhibit
17        No. 18.)
18 Q  Ma'am, I'm going to show you what's been marked
19    as Exhibit 18.  It's called a Producers'
20    Operation Manual, and ask you if you have ever
21    seen that document before?
22 A  (Witness reviews document.)  No, I have never
23    seen anything like this.
24        (The document was marked as Exhibit

Page 78

1        No. 19.)
2  Q  Mrs. Charles, what's before you now has been
3     marked as Exhibit 19.  This is a Statement of
4     Loss from MPIUA.  It is a 33-page document, and
5     ask you if you have ever seen that document
6     before today?
7  A  (Witness reviews document.)
8        MR. HOYT:  Any idea if this was
9     produced by MPIUA?
10       MR. MICHIENZIE:  I think it was
11    produced by MPIUA.
12 A  I've never seen that.
13 Q  You've never seen that?
14 A  No.
15 Q  Did you ever get a letter that is what we call a
16    Reservation of Rights letter?  Do you understand
17    what that is?
18 A  No, sir.
19 Q  Other than the letter that we've marked as
20    Exhibit 15, have you received any other letters
21    from MPIUA?
22 A  No.
23       (The document was marked as Exhibit
24       No. 20.)

Page 79

1  Q  Ma'am, what I have marked now as Exhibit 20 is a
2     letter dated July 29, 2005 from Runan Belcher of
3     Assurant to Frank Hall at MPIUA, attached to
4     which is a Statement of Loss or actually an
5     Adjuster Summary.  It is a 13-page document.
6     Have you see this document before today?
7  A  (Witness reviews document.)  No, sir.
8  Q  You were aware of a check in the amount of
9     $86,489.91 that was issued from Assurant with
10    respect to the fire loss?
11 A  That is what my lawyer told me.
12 Q  When were you first made aware of that check?
13 A  It was in 2005.  I can't remember exactly.
14 Q  This year?  Last year?
15 A  Last year.
16       MR. MICHIENZIE:  I'm just going to go
17    off the record for two minutes.
18       (Off the record.        )
19 BY MR. MICHIENZIE:
20 Q  Mrs. Charles, were you contacted directly by
21    anyone from Ocwen Federal Bank after February 2,
22    2004?
23 A  No.
24 Q  No phone calls?

Page 80

1  A  A lot of phone calls came from someone called
2     Jordon.  She just used to say, "This is Jordon
3     from Ocwen Federal Bank calling for payment."  A
4     lot of that.
5  Q  Who did she call?
6  A  Me.
7  Q  She called you?
8  A  Yes, she left the messages.
9  Q  You never spoke to her?
10 A  I called once, and I didn't get the person.  And
11    she called back -- See, I'm a lady that goes to
12    work on a morning, I leave home many times like
13    7, 6:30, 7:30, because I take care of the
14    elderly on mornings.  From there, I go to
15    Brigham & Women's Hospital.  I get home at 12 in
16    the night.  So I take the message.  When I am
17    off -- like today I'm off of Brigham.  My
18    patient I had to do today I did on Monday, so I
19    compensated here.  So today I'm free.  When I'm
20    free, I will return my calls.
21 Q  Did you ever tell this person or anybody that
22    called from Ocwen not to call you?
23 A  Yes, I left a message, I said, "Please do not
24    call back.  Anything, to contact my lawyer,

Page 97

1  A  Yes.
2  Q  I want to ask you a few more questions about how
3     you were getting your mail after the fire
4     happened. If I heard you correctly, I'm not
5     sure if you did, you still had a mailbox at the
6     Ditson Street property?
7  A  No, I did not have a mailbox there. They kept
8     it at the post office. I went to the post
9     office and I picked it up until they transferred
10    the address, until I got the apartment and they
11    transferred the address.
12 Q  After the fire, did you have to do something
13    with the post office to have your Ditson Street
14    mail forwarded to the post office?
15 A  Yes, sir.
16 Q  When did do you that?
17 A  As soon as I got the apartment I did it.
18 Q  Which was within about ten days after the fire?
19 A  Yes.
20 Q  Approximately?
21 A  Yes.
22 Q  Once you placed that forwarding order with the
23    post office, you were, in fact, receiving your
24    mail that had been sent to the Ditson Street

Page 98

1     address; correct?
2  A  Yes, at the post office.
3  Q  Has that been the case from the time you placed
4     that forwarding order all the way up until the
5     present? In other words, do you still go to the
6     post office to pick up your mail that was sent
7     to the Ditson Street address?
8  A  No, no, no. All the mails come to the new
9     address. About two weeks after, they started
10    sending it to the new address.
11 Q  Now, you have Exhibit 3 in front of you still?
12 A  Yes.
13 Q  When you received that, did you notice that it
14    stated expiration date 1/8/04 on it?
15 A  1/8/04?
16        MR. HOYT: Is the question that back
17    in '04, did she?
18        MR. CHAPMAN: Yes.
19 Q  Let me ask it again. When you received Exhibit
20    3 in the mail in early December '03, did you
21    notice that the document said "Expiration Date
22    1/8/04."
23 A  I really specifically cannot tell you I remember
24    the date, but I am a person when I receive a

Page 99

1     bill, and as soon as I receive something like
2     these things, I mail it out the same time. I do
3     not put things down to send it out. I do just
4     what I have to do.
5  Q  I just want to get the best understanding I can.
6     What was your understanding as to what
7     expiration date 1/8/04 meant?
8  A  I know what it means, that if this bill was not
9     paid by that time, my insurance would be
10    canceled.
11 Q  And that would have been your understanding in
12    early '03?
13 A  Oh, yes.
14 Q  Early December '03?
15 A  Yes.
16 Q  Did you do anything between January 8, '04 and
17    the time of the fire to determine whether or not
18    your insurance had been paid?
19 A  No, I did not ask anyone or call anyone.
20 Q  Now, you said earlier that sometime after your
21    lawsuit was filed, you did give a statement
22    under oath to Assurant Group; correct?
23 A  Yes.
24 Q  That was a statement that was being transcribed

Page 100

1     with a court reporter similar to what we're
2     doing now. Is that fair to say?
3  A  Yes.
4        MR. HOYT: I believe it was tape
5     recorded.
6  A  Tape recorded. That was tape recorded.
7  Q  Do you know if that tape recorded statement was
8     transcribed, reduced to writing?
9  A  I don't know.
10 Q  So you never reviewed any transcription of the
11    statements you gave to Assurant Group?
12 A  Not to my memory, no.
13 Q  Can you put Exhibit 17 in front of you, please?
14 A  (Witness complies.)
15 Q  This is your letter to the MPIUA, correct, from
16    1998?
17 A  Yes.
18 Q  Just a quick question on this. In the last line
19    of your letter where it says, "Please feel free
20    to contact me or my agent." Who was your agent
21    back in --
22 A  Mr. Weeks, but he died.
23 Q  Did he work with an insurance agency? Do you
24    remember the name of the company he worked for?

Page 105

1  A  Yes. That's the guy who called. Okay. And I
2     said, "Okay, I will give you Mr. Greene's
3     number," and he never got back to me or anything
4     like that. Because it's a Chinese name, I
5     remember him by Young.
6  Q  Are you saying that you did have a telephone
7     conversation with Ian Young shortly after the
8     fire?
9  A  We didn't have a big conversation. He just said
10    he represented some insurance company. I said,
11    "I do not have insurance on the property." I
12    told him that. I say, "I do not have insurance
13    on the property. The property has no insurance.
14    This is my lawyer's number. You can speak to
15    him."
16 Q  So your testimony is that you gave Mr. Young
17    Mr. Hoyt's telephone number?
18 A  Mr. Greene. His boss.
19        MR. HOYT: My firm.
20 Q  Did you have any further telephone discussion
21    with Mr. Young after that?
22 A  No.
23 Q  When you told Mr. Young you don't have any
24    insurance, did he tell you that you do have

Page 106

1     insurance, and it's with this forced placed
2     insurance company?
3  A  To the best of my knowledge, no.
4         MR. CHAPMAN: I think that's all I
5     have. Thank you.
6         MR. WHOLLEY: I will be brief.
7
8         CROSS EXAMINATION
9  BY MR. WHOLLEY:
10 Q  Ms. Charles, my name is Rich Wholley, I'm
11    representing MPIUA here today. I'm just going
12    to come over there, too.
13        MR. WHOLLEY: Can I mark this as the
14    next exhibit, please
15        (The document was marked as Exhibit
16        No. 25.)
17 Q  I want to place a document in front of you,
18    Ms. Charles. Would you take a look at that and
19    tell me when you have had a chance to review it.
20 A  (Witness reviews document.)
21 Q  Did you have a chance to review that?
22 A  Yes, sir.
23 Q  A few moments ago when Mr. Chapman, down the end
24    of the table there, was questioning you, I think

Page 107

1     you had indicated, correct me if I'm wrong, that
2     you got a letter back from MPIUA with that check
3     for $1,906 saying that MPIUA couldn't write any
4     coverage because the property was damaged. Is
5     that right?
6  A  Yes, sir.
7  Q  Is that the letter you were talking about?
8  A  Yes.
9  Q  So you did receive that?
10 A  Yes, I did receive that.
11 Q  Did that have the check enclosed?
12 A  No.
13 Q  But at that point in time, you knew from MPIUA's
14    perspective that there was no coverage in
15    effect, and they wouldn't write coverage until
16    the property would be repaired; right?
17 A  Be repaired, yes.
18 Q  Exhibit 22, I know you stated to Mr. Chapman you
19    don't recall whether you received this or not;
20    is that right? You just don't remember?
21 A  I know I received like this stating that Ocwen
22    tried to pay the insurance.
23 Q  Am I correct in stating that that $1,906 check,
24    based on your understanding, was paid by Ocwen

Page 108

1     or attempted to be paid by Ocwen to MPIUA?
2  A  Yes.
3  Q  And you understand that they attempted to make
4     that payment after the fire loss in February 2,
5     2004?
6  A  Yes, sir.
7  Q  Then you did get Exhibit 25, which advised you
8     that MPIUA was not accepting that check?
9  A  Yes, sir.
10 Q  For the reasons we have discussed?
11 A  Yes.
12 Q  Now, going back to Exhibit 3. As I understand
13    your testimony, when you received this in early
14    December of 2003, you understood that unless
15    MPIUA received a premium payment, which is
16    indicated on here, a minimum of $476.56, unless
17    they received that by January 8 of 2004, your
18    coverage with MPIUA would lapse. You understood
19    that; right?
20 A  Yes, I know that.
21 Q  That's why, just like you had done the year
22    prior in December of '02, again in December of
23    '03, you sent this thing to Ocwen?
24 A  To Ocwen, yes, I did.

# EXHIBIT 9

MASSACHUSETTS PROPERTY INSURANCE UNDERWRITING ASSOCIATION
(617) 723-3800
      392-6108

Exhibit: 3
Witness: Charles
Date: 9-20-06
CM

Insured's Name and Mailing Address

JOAN CHARLES A/K/A JOAN F. GREAVES
14 DITSON STREET
DORCHESTER, MA 02122

Producer

ONE CALL INS AGCY., INC.
121 B TREMONT ST
BRIGHTON MA 02135

Expiration Date  01/08/2004

Policy Number    0662672 - 4

The Association offers to renew this policy. To accept this renewal offer please return the tear-off portion of this invoice and payment to the Association. To avoid a lapse in coverage this invoice and payment must be received by the Association on or before the Expiration date/Due date. If payment is received within sixty days of the Expiration date/Due date the policy will be renewed as of the date of the Associations receipt of the payment. Payments received by the Association more than sixty days after the Expiration date/Due date will be rejected and the policy will not be renewed.

Any changes to the Renewal Policy may only be made by submitting an Endorsement Request to the Association after you have paid this invoice. To make the changes effective as of the inception date of the Renewal Policy, the Endorsement Request must be received by the Association on or before the inception date of the Renewal Policy.

### Please Remember

* Read the Inspection and Credit reporting notices on the reverse side.
* Make your check payable to  MASSACHUSETTS PROPERTY INSURANCE UNDERWRITING ASSOCIATION
* Write your policy number on your check.
* Mail the original tear-off portion of this Offer/Invoice and your check in the enclosed envelope.
* Mail only one original Offer/Invoice and one check per envelope. Copies of the Offer/Invoice cannot be processed by the lockbox.
* Do **not** send any other correspondence with this Offer/Invoice and your check.
* Do **not** send cash.
* Mail this Invoice and your check to the address below.

UMAEXPIH

Tear Here ─────────────────────────────────────────────── Tear Here

PLEASE WRITE YOUR POLICY NUMBER ON YOUR CHECK AND RETURN THIS
INVOICE WITH YOUR PAYMENT IN THE ENVELOPE PROVIDED.                    INVOICE

Insured's Name:  JOAN CHARLES A/K/A JOAN F. GREAVES          Policy Number:  0662672 - 4

| Date Billed | Premium Due | Minimum Due | Due Date | Amount Enclosed |
|---|---|---|---|---|
| 12/04/2003 | $1,906.00 | $476.50 | 01/08/2004 | |

Please make sure your check is made payable and sent to:

MASSACHUSETTS PROPERTY INSURANCE UNDERWRITING ASSOCIATION
PO BOX 9693
MANCHESTER, NH 03108-9693

0662672200004000170000000004765020040308

# EXHIBIT 10

HOMEOWNERS POLICY PROGRAM
THIS IS NOT A BINDER OF INSURANCE

MASSACHUSETTS PROPERTY INSURANCE UNDERWRITING ASSOCIATION
Two Center Plaza, Boston, Massachusetts 02108-1904
(617)723-3800,(800)392-6108,FAX (617)557-5678

12/04/2003



| | |
|---|---|
| POLICY NUMBER | EXPIRATION DATE |
| 0662672 - 4 | 01/08/2004 |
| NAMED INSURED & MAILING ADDRESS | PRODUCER |
| JOAN CHARLES A/K/A JOAN F. GREAVES | ONE CALL INS AGCY., INC. |
| 14 DITSON STREET | 121 B TREMONT ST |
| DORCHESTER      MA     02122 | BRIGHTON         MA     02135 |

The policy will expire at 12:01 A.M., standard time, on the expiration date shown and will not automatically be renewed. To renew your insurance, return the tear-off portion of the Renewal Offer/Premium Invoice with either the Premium Due or Minimum Due.

THE RESIDENCE PREMISES COVERED BY THE POLICY IS LOCATED AT:
14 DITSON STREET, DORCHESTER, MA 02122

This offer applies to the Residence Premises. Coverage is provided where a Premium or Limit of Liability is shown for the Coverage.

SECTION I COVERAGES:

| | | LIMIT OF LIABILITY | PREMIUM |
|---|---|---|---|
| A | Dwelling | $351,000 | $2,196 |
| B | Other Structures | $17,550 | |
| C | Personal Property | $105,300 | |
| D | Loss of Use | $105,300 | |

SECTION II COVERAGES:

| | | | |
|---|---|---|---|
| E | Personal Liability | $300,000 | $61 |
| F | Medical Payments to Others | $1,000 | |

DEDUCTIBLE SECTION I: $1,000 EXCEPT $2,000 FOR WINDSTORM OR HAIL.    TOTAL BASE PREMIUM    $2,257
IN CASE OF SECTION I LOSS, WE COVER ONLY THAT PART OF THE LOSS OVER THE DEDUCTIBLE STATED.

FORM & ENDORSEMENTS made part of this offer at the time of issue.

| | | | |
|---|---|---|---|
| DED ADJ | 10/00 | DEDUCTIBLE ADJUSTMENT | |
| HO 00 03 | 10/00 | SPECIAL FORM | -$258 |
| HO 01 20 | 09/01 | SPECIAL PROVISIONS - MASSACHUSETTS | |
| HO 04 16 | 10/00 | PREMISES ALARM OR FIRE PROTECTION SYSTEM | |
| HO 04 27 | 04/02 | LIMITED FUNGI, WET OR DRY ROT, OR BACTERIA COVERAGE | -$44 |
| HO 04 96 | 10/00 | NO SECTION II-LIABILITY FOR HOME DAY CARE COVERAGES | |
| HO 23 71 | 09/01 | MASSACHUSETTS TENANTS RELOCATION EXPENSE | |
| HO 24 41 | 09/01 | LEAD POISONING EXCLUSION - MASSACHUSETTS | $8 |
| HO FP | 12/01 | SPECIAL ENDDORSEMENT | -$57 |

| | |
|---|---|
| TOTAL PREMIUM ADJUSTMENT | -$351 |
| TOTAL ANNUAL PREMIUM | $1,906 |
| 25% DOWNPAYMENT (IF APPLICABLE) | $476.50 |

MORTGAGEE
OCWEN FEDERAL BANK FSB
ISAOA ATIMA
WILLIS ST
NEW BEDFORD    MA    02740

MORTGAGEE
CONSECO FINANCE MTG CORP
ISAOA ATIMA
P O BOX 6075
RAPID CITY       SD    57709-6075

RATING INFORMATION:    FAMILY    0003    Frame    TERRITORY    02    PROTECTION    02

TO INSURED: THE RENEWAL OFFER/PREMIUM INVOICE HAS BEEN SENT TO YOUR PRODUCER
IF IT IS NOT ENCLOSED WITH THIS NOTIFICATION.

12-04-2003                            UMAHOEXP                                     INSURED COPY